JS 44 (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

**I. (a) PLAINTIFFS**

ZALDANA, HUGO

**DEFENDANTS**

KB HOME et al

(b) County of Residence of First Listed Plaintiff Contra Costa County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant Los Angeles County
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

Brayton Purcell LLP
222 Rush Landing Road
Novato CA 94948
Tel: 415-898-1555

Alan R. Brayton, Esq.
Peter Fredman, Esq. (to be lead noticed)
pfredman@braytonlaw.com
Charlotte E. Scott, Esq.

Attorneys (If Known)

08-3399EDL

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question (U.S. Government Not a Party)
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [X] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**: 110 Insurance; 120 Marine; 130 Miller Act; 140 Negotiable Instrument; 150 Recovery of Overpayment & Enforcement of Judgment; 151 Medicare Act; 152 Recovery of Defaulted Student Loans (Excl. Veterans); 153 Recovery of Overpayment of Veteran's Benefits; 160 Stockholders' Suits; 190 Other Contract; 195 Contract Product Liability; 196 Franchise

**REAL PROPERTY**: 210 Land Condemnation; 220 Foreclosure; 230 Rent Lease & Ejectment; 240 Torts to Land; 245 Tort Product Liability; [X] 290 All Other Real Property

**TORTS — PERSONAL INJURY**: 310 Airplane; 315 Airplane Product Liability; 320 Assault, Libel & Slander; 330 Federal Employers' Liability; 340 Marine; 345 Marine Product Liability; 350 Motor Vehicle; 355 Motor Vehicle Product Liability; 360 Other Personal Injury

**PERSONAL INJURY**: 362 Personal Injury—Med. Malpractice; 365 Personal Injury — Product Liability; 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**: 370 Other Fraud; 371 Truth in Lending; 380 Other Personal Property Damage; 385 Property Damage Product Liability

**CIVIL RIGHTS**: 441 Voting; 442 Employment; 443 Housing/ Accommodations; 444 Welfare; 445 Amer. w/Disabilities - Employment; 446 Amer. w/Disabilities – Other; 440 Other Civil Rights

**PRISONER PETITIONS**: 510 Motions to Vacate Sentence; Habeas Corpus: 530 General; 535 Death Penalty; 540 Mandamus & Other; 550 Civil Rights; 555 Prison Condition

**FORFEITURE/PENALTY**: 610 Agriculture; 620 Other Food & Drug; 625 Drug Related Seizure of Property 21 USC 881; 630 Liquor Laws; 640 R.R. & Truck; 650 Airline Regs.; 660 Occupational Safety/Health; 690 Other

**LABOR**: 710 Fair Labor Standards Act; 720 Labor/Mgmt. Relations; 730 Labor/Mgmt.Reporting & Disclosure Act; 740 Railway Labor Act; 790 Other Labor Litigation; 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**: 462 Naturalization Application; 463 Habeas Corpus – Alien Detainee; 465 Other Immigration Actions

**BANKRUPTCY**: 422 Appeal 28 USC 158; 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**: 820 Copyrights; 830 Patent; 840 Trademark

**SOCIAL SECURITY**: 861 HIA (1395ff); 862 Black Lung (923); 863 DIWC/DIWW (405(g)); 864 SSID Title XVI; 865 RSI (405(g))

**FEDERAL TAX SUITS**: 870 Taxes (U.S. Plaintiff or Defendant); 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**: 400 State Reapportionment; 410 Antitrust; 430 Banks and Banking; 450 Commerce; 460 Deportation; 470 Racketeer Influenced and Corrupt Organizations; 480 Consumer Credit; 490 Cable/Sat TV; 810 Selective Service; 850 Securities/Commodities/ Exchange; 875 Customer Challenge 12 USC 3410; 890 Other Statutory Actions; 891 Agricultural Acts; 892 Economic Stabilization Act; 893 Environmental Matters; 894 Energy Allocation Act; 895 Freedom of Information Act; 900 Appeal of Fee Determination Under Equal Access to Justice; 950 Constitutionality of State Statutes

**V. ORIGIN** (Place an "X" in One Box Only)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):
12 U.S.C. 2607, 2608 et seq.

Brief description of cause:
RESPA Class Action on Behalf of Purchasers of KB Home residences

**VII. REQUESTED IN COMPLAINT:** [X] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 — **DEMAND $**

CHECK YES only if demanded in complaint: **JURY DEMAND:** [X] Yes [ ] No

**VIII. RELATED CASE(S) IF ANY** — **PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".**

**IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2) (PLACE AND "X" IN ONE BOX ONLY)** [X] SAN FRANCISCO/OAKLAND [ ] SAN JOSE

DATE 7-15-08

SIGNATURE OF ATTORNEY OF RECORD

PETER FREDMAN

JS 44 Reverse (Rev. 12/07)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.** (a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II. Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III. Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V. Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII. Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**BRAYTON PURCELL LLP**
ALAN R. BRAYTON (Bar No. 73685)
PETER B. FREDMAN (Bar No. 189097)
CHARLOTTE E. SCOTT (Bar No. 225581)
222 Rush Landing Road
Novato, CA 94948-6169
Telephone: (415) 898-1555
Facsimile: (415) 898-1247
Email: pfredman@braytonlaw.com

Attorneys for Plaintiff HUGO ZALDANA and all others similarly situated

FILED
08 JUL 15 PM 12:43
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EDL

HUGO ZALDANA, individually and on behalf of all others similarly situated,

Plaintiff,

v.

KB HOME, a Delaware corporation; HOMESAFE ESCROW COMPANY, a Delaware corporation; COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation; COUNTRYWIDE HOME LOANS, INC., a New York corporation; COUNTRYWIDE MORTGAGE VENTURES, L.L.C., a Delaware company; LANDSAFE, INC., a Delaware corporation; LANDSAFE APPRAISAL SERVICES, INC., a California corporation; and DOES 1-100, inclusive,

Defendants.

Case No. CV 08 3399

**CLASS ACTION**

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

(1) RESPA SECTION 8 VIOLATIONS (12 U.S.C. § 2067)

(2) RESPA SECTION 9 VIOLATIONS (12 U.S.C. § 2068)

(3) UNFAIR COMPETITION LAW VIOLATIONS (CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ*)

**JURY TRIAL DEMANDED**

Plaintiff brings this suit on behalf of himself and all others similarly situated, and makes the following allegations on the information and belief of his attorneys, except as to allegations specifically pertaining to plaintiff, which are based on his personal knowledge and documents:

**INTRODUCTION**

1. Plaintiff seeks class wide remedies for systematic violations of the Real Estate Settlement Procedures Act (RESPA) in connection with the sale of KB Home residences in California. 12 U.S.C. § 2061 *et seq;* see also 24 C.F.R. 3500.1 *et seq*.

2. In 2005, defendants KB (a large residential builder) and Countrywide (a large residential lender) entered into referral arrangement – personified in an a "joint venture" unincorporated organization known as "Countrywide KB Home Loans" (CKBHL) – designed to circumvent RESPA Section 8's prohibition of collusion and kickbacks in connection with the provision of real estate settlement services. Through the CKBHL arrangement, KB Home referred its customers' mortgage business to Countrywide as part of an unlawful ongoing exchange of monetary and non-monetary "things of value" (as that term is defined in RESPA Section 8 and its implementing regulations) including, for example, predetermined loan approvals (including predetermined appraisals provided by the Countrywide's Landsafe subsidiary).

3. The CKBHL arrangement was a prototypical "sham" Affiliated Business Arrangement (ABA) within the meaning of RESPA because, for example, CKBHL was not a real stand-alone entity, the mortgage services it ostensibly provided were performed by Countrywide agents, it funded loans with Countrywide funds and assigned every loan to Countrywide, and KB's "ownership" interest was limited to the particular mortgages generated through the referral arrangement. In any event, the arrangement violated RESPA because the things of value exchanged exceeded any legitimate "return on the ownership interest or franchise relationship" that may have been involved.

4. As statutory redress for these RESPA Section 8 violations, the KB and Countrywide defendants are jointly and severally liable for an amount equal to three times

the amount charged for the settlement services involved, as set forth on the Uniform Settlement Statements issued pursuant to RESPA in connection with each transaction, as well as costs and attorneys fees.

5. First American Title Company (FATCO) acted as the settlement agent and title insurance provider for these and all KB transactions in California. KB is liable for violations of RESPA Section 9 because, through its Homesafe escrow subsidiary, among other means, it forced its customers to use and purchase title insurance from FATCO. As statutory redress for these RESPA Section 9 violations, KB is liable to its customers for an amount equal to three times the amount of the charges for title insurance charged to KB customers.

**PARTIES**

6. Plaintiff Hugo Zaldana is an individual who purchased a KB Home at 100 Spears Circle, Richmond, Contra Costa County, California. He first entered into a contract to purchase it on or about May 3, 2007, and the transaction closed escrow on or about November 16, 2007. Like the vast majority of KB customers, he financed the transaction with Countrywide through a "federally related mortgage loan" (as defined in 12 U.S.C. § 2602(1)) provided through the CKBHL arrangement, and paid the settlement service fees in connection with that transaction as set forth on the Uniform Settlement Statement (as defined in 12 U.S.C. § 2603) prepared by FATCO as settlement agent for the lender (generally, and in Mr. Zaldana's case, CKBHL). Like all KB customers who financed through the CKBHL arrangement, he was required to pay mortgage origination type service fees to CKBHL and/or Countrywide, including appraisal service fees to Landsafe. Like all KB customers, he was required to pay his earnest money deposit to Homesafe and purchase title insurance from FATCO.

7. Defendant KB HOME (KB) is a Delaware corporation with its principal place of business and national headquarters in Los Angeles County, California. KB is the ultimate publicly traded parent corporation and holding company of the KB conglomerate of companies. Wherever the term "KB" is used herein it refers to KB and its direct and

indirect subsidiaries.

8. Defendant HOMESAFE ESCROW COMPANY (Homesafe) is a Delaware corporation with its principal place of business and national headquarters at the KB headquarters in Los Angeles County, California. It is and was at all relevant times a wholly owned subsidiary of KB. Note, however, that for a period in 2001-2004 FATCO owned 5% of it and KB owned the other 95%.

9. Defendant COUNTRYWIDE FINANCIAL CORPORATION (CFC) is a Delaware corporation with its principal place of business and national headquarters at 4500 Park Granada, Calabasas, California. CFC is the ultimate publicly traded parent corporation and holding company of the Countrywide conglomerate of companies. Wherever the term "Countrywide" is used herein it refers to CFC and subsidiary organizations.

10. Defendant COUNTRYWIDE MORTGAGE VENTURES, L.L.C. (CMV) is a Delaware limited liability company with its principal place of business and national headquarters at 4500 Park Granada, Calabasas, California. It is a wholly owned subsidiary of CFC and part of Countrywide.

11. Defendant COUNTRYWIDE HOME LOANS, INC. (CHL) is a New York corporation with its principal place of business and national headquarters at 4500 Park Granada, Calabasas, California. It is a wholly owned subsidiary of CFC and part of Countrywide.

12. Defendant LANDSAFE INC. ("Landsafe") is a Delaware corporation with its principal place of business and national headquarters at 4500 Park Granada, Calabasas, California. It is a wholly owned subsidiary of CFC and part of Countrywide.

13. Defendant LANDSAFE APPRAISAL SERVICES, INC. is a California corporation with its principal place of business and national headquarters at 4500 Park Granada, Calabasas, California. It is a wholly owned subsidiary of CFC and part of Countrywide.

14. The true names and capacities, whether individual, corporate, associate, governmental, or otherwise, of defendants DOES 1 through 100 are unknown to plaintiff at

this time. Plaintiff therefore sues said defendants by such fictitious names. When the true names and capacities of said defendants have been ascertained, plaintiff will amend this complaint accordingly. Plaintiff is informed and believes, and on that basis alleges, that each defendant designated herein, including each DOE, is responsible, willfully, negligently, or in some other actionable manner, for the events and happenings, and violations of California law, hereinafter alleged, and that they caused plaintiff and the class members harm and damages.

15. Plaintiff alleges on information and belief that at all times relevant hereto each of the defendants, including each DOE, was the agent, servant, employee, joint-venturer, partner, successor-in-interest, and/or co-conspirator of each other defendant and was at all said times acting in the full course and scope of said agency, service, employment, joint venture, concert of action, partnership, successorship, or conspiracy.

**JURISDICTION AND VENUE**

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because one or more claims arise under the laws of the United States, and pursuant to 12 U.S.C. § 2614 because the plaintiffs allege violations of the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2607(a)-(c) that occurred in the Northern District of California.

17. Venue is proper in the Northern District of California pursuant to 28 U.S.C. §1391(b)(2) and 12 U.S.C. § 2614 in that the unlawful conduct that gives rise to these claims occurred within the Northern District of California, and pursuant to and 12 U.S.C. § 2614 in that real property subject to these claims is located within the Northern District of California.

**FACTUAL ALLEGATIONS**

18. Until sometime in 2005, KB sold mortgage services to its customers through a wholly owned subsidiary, KB Home Mortgage Company (KBHMC). This business ceased operations in 2005 in connection with Department of Housing and Urban Development (HUD) investigation and charges of "poor underwriting practices such as

approving loans to borrowers who were not eligible; approving loans based on overstated or incorrect income; failing to include all of borrowers' debts; failing to properly verify sources of funds" etc. HUD Press Release 7/6/05. KB paid a $3.2 Million fine to settle these charges. Ibid.

19. In 2005, to replace the KBHMC arrangement, KB entered into the subject "joint venture" referral arrangement with Countrywide. The parties eventually established the "Countrywide KB Home Loans" brand and a theoretical structure that deemed CMV (d/b/a Countrywide KB Home Loans) as the "lender" and CHL as its "agent" and the "originator" or "mortgage broker" of the mortgages involved.

20. Defendant CMV was a preexisting Countrywide entity, apparently developed for the purpose of providing such "turn-key" lending operations. Incorporated in 2001, in 2002 it obtained licensure as a "mortgage bank" from the California Department of Corporations (DOC) under the California Residential Mortgage Lending Act (RML). During the relevant period, it established approximately 150 sub-licensed CMV mortgage bank "branch" locations, the vast majority of which have absolutely no relationship to KB.

21. Defendant CHL is Countrywide's first and primary operating entity and its primary retail sales organization for residential mortgages, among other things. The entity itself has been licensed by the California Department of Real Estate (DRE) as a corporate real estate broker since 1970 (Angelo Mozilo is the designated broker of record). In the 1990s it was licensed as a DOC RML "mortgage bank" (unrelated to CMV) and, as such, operates a number of sub-licensed CHL mortgage bank "branch" locations.

22. Starting in 2005, CMV sub-licensed approximately seven CMV mortgage bank branch locations as "dba Countrywide KB Home Loans" and Countrywide began selling and funding mortgages associated with KB referrals in the name of CKBHL, sometimes further described as "a Countrywide Mortgage Ventures, L.L.C. Series". [A "series" L.L.C. is an entity form unique to Delaware that provides for independent sub-entities. The form is not recognized by California law.]

///

23. These CMV branch locations were, as a practical matter, elements of Countrywide, with which they generally shared employees, office space, administrative resources, systems, networks, documentation, etc. The ostensible function of the CKBHL branded CMV branch offices (which were invariably part of or attached to other Countrywide components) was processing loan applications, conducting underwriting, and making funding arrangements for mortgages sold to KB customers by CHL based on referrals from KB. The loan funds came from Countrywide, and the loans were assigned to Countrywide immediately upon the close of escrow.

24. Management of the CKBHL offices flowed up to Countrywide executives, including those responsible for the KB relationship, which entitled KB sales executives to involve themselves in micro CKBHL processes (e.g., "where is my loan approval on X?"). Loan fees and mortgage resale profits were divided between KB and Countrywide based on business conditions. As the real estate market deteriorated, for example, the companies set up financing processes and programs whereby KB paid Countrywide to make loans with subsidized initial payments to KB buyers. This allowed KB to prop up the ostensible sales price of KB houses and sell to buyers who would not otherwise be able to afford or qualify for the monthly payments. Landsafe appraisers would ignore the subsidies in order to appraise the house at the full stated sales price plus credits, which was necessary in order to close the transaction and securitize the mortgage, which was handled by Countrywide.

25. From the perspective of KB/Countrywide customers and sales employees, the CKBHL arrangement – referred to as Countrywide or the "joint venture" – had no independent existence apart from KB and/or Countrywide. Prospective KB purchasers were required to authorize KB and Countrywide to run their credit scores through Countrywide's system so that CHL could "qualify" them for financing. After obtaining this qualification, KB would enter into contract with the customer. Upon execution of a KB purchase-sale contract the KB customer was referred to CHL sales representatives (ostensibly acting as "agents" for CKBHL) for mortgage origination services. The CHL representatives were were obliged to refer the origination to CKBHL/Countrywide.

26. Although KB customers were technically free to obtain financing from alternative sources, they were strongly steered to Countrywide. For example, Mr. Zaldana's initial contract included approximately $86,000 in credits and subsidies (off a $575,000 purchase price) conditioned on using Countrywide/CKBHL financing. On the flip side, KB customers were warned that the failure to use Countrywide/CKBHL could result in a charge of $200 a day if their lender failed to timely fund the transaction, and that that was a serious concern when using an outside lender. Using alternative lenders generally proved impractical for those who tried, especially as the real estate market declined, because KB demanded a funding commitment that was not subject to appraisal, and such a commitment could only be obtained through the Countrywide/CKBHL arrangement, which relied on Landsafe, which it controlled.

27. To initiate transactions, which generally called for a small earnest money deposit and delivery by KB upon completion in 6-9 months, KB customers were instructed to bring a deposit check payable to Homesafe, and sign escrow instructions that ostensibly authorized Homesafe to retain a sub-agent (FATCO) to perform the escrow/title function. In fact, Homesafe paid the money over to KB, and KB and FATCO instituted an un-funded escrow account at FATCO. KB customers were never given any option other than to pay their earnest money to Homesafe, which invariably forced them to purchase FATCO title insurance and services.

28. To close the transactions, typically 6-9 months after the contract date, KB notified its customers of the impending close of escrow (i.e. settlement) of the transaction and instructed them that FATCO would be handling the closing (i.e. is the settlement agent). FATCO would then deliver to KB customers an estimate of the settlement charges and funds required, including title insurance and service charges payable to FATCO.

29. The RESPA Uniform Settlement Statement prepared in connection with plaintiff's transaction is attached hereto as Exhibit A and incorporated herein by reference. He paid the settlement service fees as indicated except that the "POC" charges for loan origination and discount fees represent direct payments by KB to Countrywide (Mr. Zaldana

did not pay them). As is the case for all KB transactions financed through the CKBHL arrangement, KB, Countrywide, FATCO, or their subsidiaries captured all settlement services fees.

30. On information and belief, CKBHL loan proceeds were never delivered to escrow per se. Instead, Countrywide wired the loan proceeds (net of charges and credits payable to Countrywide and its subsidiaries) directly to KB, which delivered funds to escrow as necessary to pay third party charges (such as FATCO fees). On information and belief, through this arrangement, the lender fees payable to CKBHL pursuant to the Uniform Settlement Statement were split in some manner between KB and Countrywide.

**CLASS ALLEGATIONS**

31. Plaintiff brings this action on behalf of himself and all other persons who purchased KB homes in California in RESPA governed transactions, including the majority sub-class representing such persons who did so using the CKBHL financing arrangement.

32. The class is composed of thousands of people, whose joinder in this action would be impracticable. The disposition of their claims through this class action will benefit the class members, the parties, and the courts.

32. The identities and addresses of the individual members of the class are available through public records, as well as defendants' and FATCO's records, including the RESPA Uniform Settlement Statements generated as a legal requirement in connection with each transaction.

34. All information necessary to ascertain the damages amounts due to each of the class members is objective and set forth on the RESPA Uniform Settlement Statements associated with their transactions.

35. There is a well-defined community of interest in questions of law and fact affecting the class. These questions of law and fact predominate over individual questions affecting individual class members, including, but not limited to, the following:

(a) whether, under RESPA Section 8, the CKBHL arrangement is a "sham" ABA as that term is defined in RESPA regulations, and the closely related

question of whether the benefits exchanged between KB and Countrywide under the CKBHL arrangement exceeded any legitimate ownership interests that may have been involved; and

(b) whether, under RESPA Section 9, KB required its customers to purchase title insurance from FATCO.

36. Absent a class action, defendants' unlawful conduct will not be redressed and will continue and the victims of it will not be compensated in any way. Defendants' unlawful conduct must be redressed because it represents a deliberate and ongoing effort to circumvent RESPA and is the type of wrongful and unlawful conduct that caused the current mortgage crisis.

## FIRST CLAIM FOR RELIEF

**(Against the KB and Countrywide Entities for Violations of 12 U.S.C. § 2067)**

37. Plaintiff incorporates the allegations of paragraphs 1 through 36.

38. 12 U.S.C. § 2067 of RESPA (Section 8) regulates referral relationships and payments as follows:

> **(a) Business referrals**
> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.
>
> **(b) Splitting charges**
> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.
>
> **(c)(4) [Affiliated Business Arrangements (ABAs)]**
> Nothing in this section shall be construed as prohibiting … affiliated business arrangements so long as (A) ...disclosure is made of the existence of such an arrangement … (B) …[the consumer is] not required to use any particular provider of settlement services … [except that the lender may select the appraiser] and (C) ...the only thing of value that is received from the arrangement, other than the payments permitted under this subsection, is a return on the ownership interest or franchise relationship…
>
> **(d)(2) [Penalties For Violations]**
> Any person or persons who violate the prohibitions or limitations of this

> section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service.

12 U.S.C. § 2067 (RESPA Section 8)

39. Defendants provided "settlement services" within the meaning of RESPA. 12 U.S.C. § 2062(3).

40. The settlement services so provided were in connection with "federally related mortgage loan[s]" as defined in 12 U.S.C. § 2602(1).

41. Defendants violated RESPA Section 8 by engaging in a scheme to refer settlement services to Countrywide and its subsidiaries in exchange for monetary and non-monetary "thing[s] of value" including predetermined loan approvals (and appraisals) and sharing in the proceeds of the referrals. 12 U.S.C. § 2067(a).

42. The "ABA exception" to RESPA Section 8 does not apply because CKBHL is not a bona fide settlement service provider within the meaning of RESPA and its implementing regulations. See *HUD Statement of Policy 1996-2, Regarding Sham Controlled Business Arrangements*, 61 Fed.Reg. 29258 (June 7, 1996); see 24 CFR § 3500.4(a)(1)(ii) (the *HUD Statement of Policy* imbues with the force of federal regulations).

43. On the contrary, CKBHL is a prototypical example of a sham ABA:

> "In many of the arrangements that have come to HUD's attention, the substantial functions of the settlement service business that the new arrangement purports to provide are actually provided by a pre-existing entity that otherwise could have received referrals of business directly. In such arrangements the entity actually performing the settlement services reduces its profit margin and shares its profits with the referring participant in the arrangement. In some situations, such as in the last example, companies that could have received referrals of settlement service business directly (hereafter "creators") have assisted the referring parties in creating wholly owned subsidiaries at little or no cost to the referring party. These subsidiaries in turn refer or contract out most of the essential functions of its settlement service business back to a creator that helped set them up or use the creator to run the business.

*HUD Statement of Policy, supra,* at 292959.

44. Whether CKBHL is a "sham" versus "bona fide" ABA is a factual issue, which looks to general business practices of the ABA as opposed to individual transactions, and weighs the following factual questions:

(1) Does the new entity have sufficient initial capital and net worth, typical in the industry, to conduct the settlement service business for which it was created? Or is it undercapitalized to do the work it purports to provide?

(2) Is the new entity staffed with its own employees to perform the services it provides? Or does the new entity have "loaned" employees of one of the parent providers?

(3) Does the new entity manage its own business affairs? Or is an entity that helped create the new entity running the new entity for the parent provider making the referrals?

(4) Does the new entity have an office for business which is separate from one of the parent providers? If the new entity is located at the same business address as one of the parent providers, does the new entity pay a general market value rent for the facilities actually furnished?

(5) Is the new entity providing substantial services, i.e., the essential functions of the real estate settlement service, for which the entity receives a fee? Does it incur the risks and receive the rewards of any comparable enterprise operating in the market place?

(6) Does the new entity perform all of the substantial services itself? Or does it contract out part of the work? If so, how much of the work is contracted out?

(7) If the new entity contracts out some of its essential functions, does it contract services from an independent third party? Or are the services contracted from a parent, affiliated provider or an entity that helped create the controlled entity? If the new entity contracts out work to a parent, affiliated provider or an entity that helped create it, does the new entity provide any functions that are of value to the settlement process?

(8) If the new entity contracts out work to another party, is the party performing any contracted services receiving a payment for services or facilities provided that bears a reasonable relationship to the value of the services or goods received? Or is the contractor providing services or goods at a charge such that the new entity is receiving a "thing of value" for referring settlement service business to the party performing the service?

(9) Is the new entity actively competing in the market place for business? Does the new entity receive or attempt to obtain business from settlement service providers other than one of the settlement service providers that created the new entity?

(10) Is the new entity sending business exclusively to one of the settlement service providers that created it (such as the title application for a title policy to a title insurance underwriter or a loan package to a lender)? Or does the new entity send business to a number of entities, which may include one of the providers that created it?

*HUD Statement of Policy, supra,* at 292962.

45. The CKBHL arrangement is a sham ABA because (tracking the factors above) (1) it does not actually represent a stand-alone entity, but merely a component of CMV and Countrywide; (2) it is operated entirely by Countrywide employees or "loaned" Countrywide employees; (3) it is run by Countrywide employees and agents, subject to improper business influence of KB agents, which influence is itself a critical thing of value provided to KB by Countrywide in exchange for the business referrals; (4) its offices are components of Countrywide offices (in fact ) and CMV offices (by law); (5)-(8) it does not perform substantial services, and the services which it ostensibly performs are merely "carved out" of the broader flow of mortgage origination and lending services that Countrywide typically provides itself in the ordinary course of its lending operations; (9) it does not compete or seek to compete in the broader marketplace, nor provide any scope of services which are typically marketed or marketable, and (10) its sole purported function is interim involvement in loans originated by Countrywide (CHL) based on KB referrals and the sole purpose of that function is circumventing RESPA Section 8.

46. In any event, the things of value exchanged between KB, Countrywide, and CKBHL in connection with the arrangement exceeded any "return on the ownership interest or franchise relationship" that may have been involved. Aside from the monetary exchanges involved (the full details of which are unknown to plaintiff), critical "things of value" that KB received were (a) the provision of loans to KB customers who would not otherwise have qualified for them (including a whole host of unsavory lending practices such as converting loan applications to "stated income" applications and falsifying stated incomes) and (b) the acceptance of KB's sales price as the appraised value of the property regardless of credits and subsidies involved in the transaction, changes in market conditions that may occurred between the time of contracting and completion, or inconsistent parallel sales prices of comparable properties. Similarly, Countrywide received obligatory cross-referrals to its subsidiary settlement service providers such as CHL and Landsafe.

47. The portion of the fees that KB receives for settlement services payable to CKBHL pursuant to the Settlement Statements represent unearned fees in violation of 12 U.S.C. § 2067(b). Additionally, the appraisal fees that Landsafe/Countrywide received represent unearned fees in violation of 12 U.S.C. § 2067(b) because predetermined appraisals do not represent the legitimate provision of services under RESPA.

48. Defendants are equitably estopped by their own fraudulent conduct and concealment from asserting the one year RESPA statute of limitations as an affirmative defense against absent class members with respect to these claims.

49. Based on these RESPA violations, defendants are thus "liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service" since the inception of the CKBHL arrangement, as well as attorneys fees and costs. 12 U.S.C. § 2067(d)(2).

50. The settlement services involved in the subject violations include "the origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of loans)" as well as appraisal services provided by Landsafe. 12 U.S.C. § 2062(3).

51. Plaintiff and the plaintiff class are entitled to three times the amount of the charges paid for such services as well as attorneys' fees and costs.

**SECOND CLAIM FOR RELIEF**

**(Against the KB Entities for Violation of 12 U.S.C. § 2068)**

52. Plaintiff incorporates the allegations of paragraphs 1 through 36.

53. 12 U.S.C. § 2068 of RESPA (Section 9) prohibits sellers from requiring buyers to purchase title insurance from a particular provider, as follows:

> (a) No seller of property that will be purchased with the assistance of a federally related mortgage loan shall require directly or indirectly, as a condition to selling the property, that title insurance covering the property be purchased by the buyer from any particular title company.
>
> (b) Any seller who violates the provisions of subsection (a) of this section shall be liable to the buyer in an amount equal to three times all charges made for such title insurance.

12 U.S.C. § 2068 (RESPA Section 9)

54. Plaintiff and the plaintiff class purchased properties from KB with the assistance of "federally related mortgage[s]" as defined in 12 U.S.C. § 2602(1).

55. Defendants violated RESPA Section 9 by requiring purchasers to use and purchase title insurance from FATCO as described in paragraphs 27-29 above.

56. Defendants are thus liable to plaintiff and the plaintiff class in an amount equal to three times all charges for such title insurance.

**THIRD CLAIM FOR RELIEF**

**(Against All Defendants for Violation of Cal. Bus. & Prof. Code § 17200 *Et Seq*)**

57. Plaintiff incorporates the allegations of paragraphs 1 through 57.

58. California Business & Professions Code §§ 17200 *et seq* (the Unfair Competition Law – "UCL") defines unfair competition to include any unlawful, unfair or fraudulent business act or practice.

59. Defendants conduct was unlawful within the meaning of the UCL based on the RESPA violations alleged herein and unfair and fraudulent based on the facts alleged hereinabove. See 12 U.S.C. § 2067(d)(6) (No provision of State law or regulation that imposes more stringent limitations on affiliated business arrangements shall be construed as being inconsistent with this section); 12 U.S.C. § 2616 (state laws unaffected).

60. Plaintiff and the plaintiff class have suffered injury in fact and have lost money as a result of paying unlawful settlement charges and charges for which no legitimate services were provided such as charges imposed in connection with predetermined loan approvals and appraisals.

61. Defendants wrongful conduct impacts the public interest because it is a pattern of illegal conduct that has been repeated on thousands of occasions and continues to the present.

62. Plaintiff, for himself and on behalf of others similarly situated, seeks to enjoin defendants conduct and obtain restitution of all funds obtained by defendants by reason of and through the use of these practices within the four years preceding the filing of this

Complaint.

**DEMAND FOR JURY TRIAL**

63. Plaintiff hereby demands a trial by jury on all claims so triable.

**PRAYER FOR RELIEF**

Plaintiff prays for relief and a judgment against defendants, as follows:

A. An order certifying the Plaintiff Class, appointing named plaintiff as representative of the Class, and appointing the law firm(s) representing plaintiff as counsel for the Class;

B. Treble damages for each violation of RESPA alleged herein;

C. Restitution of all monies obtained by defendants through their unlawful or unfair practices under the UCL;

D. Imposition of a constructive trust upon all assets defendants have acquired from the Class as a result of these unlawful late fees (Civil Code § 2224);

E. The issuance of injunctive orders enjoining and/or restricting defendants operations as may be necessary to obtain compliance with RESPA and the UCL;

F. Payment of costs of suit herein incurred;

G. Pre- and post-judgment interest on amounts awarded;

H. Attorneys' fees, costs and expenses pursuant to Code of Civil Procedure §1021.5, RESPA Section 8, and any other applicable authority; and

I. For such other and further relief as the Court may deem proper.

Dated: July 15, 2008

BRAYTON PURCELL LLP

By: [signature]
Peter B. Fredman
Attorneys for Plaintiff

# EXHIBIT "A"



First American Title Company

6665 Owens Drive • Pleasanton, CA 94588

## *Buyer's Settlement Statement*

***Amended: Wednesday Nov 14, 2007 11:52 AM***

**Property:** 100 Spears Circle, Richmond, CA 94801
Lot: 106 Tract: 8755

**File No:** 0105-598755-106
**Officer:** Annette Maravich/AM
**New Loan No:** 169881998
**Settlement Date:**
**Disbursement Date:** 11/16/2007
**Print Date:** 11/14/2007, 11:52 AM

**Buyer:** Hugo Zaldana
**Address:** 691 9th Street, Apt #1, Richmond, CA 94801
**Seller:** KB Home South Bay Inc.
**Address:** 6700 Koll Center Parkway, Suite 200, Pleasanton, CA 94566

| Charge Description | Buyer Charge | Buyer Credit |
|---|---|---|
| **Consideration:** | | |
| Total Consideration | 438,000.00 | |
| | | |
| **Adjustments:** | | |
| Deposit retained by Homesafe | | 10,420.00 |
| Credit from Seller to Buyer for CC EST | | 8,758.01 |
| | | |
| **Prorations:** | | |
| County Tax 11/16/07 to 01/01/08 @$2744.00/yr | 345.82 | |
| | | |
| **New Loan(s):** | | |
| Lender: CKBHL, a CW Mtg. Venture, LLC | | |
| New Loan to File - CKBHL, a CW Mtg. Venture, LLC | | 416,100.00 |
| Interest on New Loan 11/15/07 to 12/01/07 @$68.400000/day - CKBHL, a CW Mtg. Venture, LLC | 1,094.40 | |
| Loan Origination Fee - CKBHL, a CW Mtg. Venture, LLC POC-L $4,161.00 | | |
| Loan Discount Points 1.0000% - CKBHL, a CW Mtg. Venture, LLC POC-S $4,161.00 | | |
| Lender Fee - CKBHL, a CW Mtg. Venture, LLC | 1,105.00 | |
| Appraisal Fee - LandSafe Appraisal Services, Inc | 520.00 | |
| Credit Report - LandSafe Credit, Inc. | 35.00 | |
| Tax Service Fee - Countrywide Tax Service Corporation | 81.00 | |
| Flood Check Fee - LandSafe Flood Determination, Inc. | 26.00 | |
| Aggregate Accounting Adjustment - CKBHL, a CW Mtg. Venture, LLC | 73.94 | |
| County Property Taxes 5 mo(s) @$364.27/mo - CKBHL, a CW Mtg. Venture, LLC | 1,821.35 | |
| Hazard Insurance 3 mo(s) @$50.00/mo - CKBHL, a CW Mtg. Venture, LLC | 150.00 | |
| | | |
| **Title/Escrow Charges to:** | | |
| Escrow Fee - First American Title Company | 933.00 | |
| Eagle Owners Policy - First American Title Company | 653.10 | |
| Eagle Lenders Policy - 1 - First American Title Company | 279.90 | |
| Special Messenger Service - Estimate - First American Title Company | 75.00 | |
| Record Deed - First American Title Company Attn: FAT-NCD-06-319 #100333 | 25.00 | |
| Record Trust Deed - 1 - First American Title Company Attn: FAT-NCD-06-319 #100333 | 90.00 | |
| Record Notice of Completion - First American Title Company Attn: FAT-NCD-06-319 #100333 | 13.00 | |
| County Documentary Transfer Tax - First American Title Company Attn: FAT-NCD-06-319 #100333 | 481.80 | |
| | | |
| **Disbursements Paid:** | | |
| Fire Insurance Premium to Buyers Agent (Estimate) | 1,000.00 | |
| Property Disclosure Report to First American Natural Hazard Disclosures | 30.00 | |
| 1st installment 2007-08 taxes to Contra Costa County Tax Collector POC-S $959.61 | | |
| | | |
| **Cash (X From) ( To) Borrower** | | 11,555.30 |
| | | |
| **Totals** | 446,833.31 | 446,833.31 |
| | | |

BUYER(S):

______________________________
Hugo Zaldana

**Initials:** ____________ ____________