**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

HUGO ZALDANA, individually and on behalf of all others similarly situated,

Plaintiff,

v.

KB HOME, et al.,

Defendants.

No. C-08-3399 MMC

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS**

Before the Court is the motion, filed March 30, 2009 by defendants Countrywide Financial Corporation ("CFC"), Countrywide Home Loans, Inc. ("CHL"), Countrywide Mortgage Ventures, LLC ("CMV"), and Countrywide KB Home Loans ("CKB") (collectively, "Countrywide defendants"), to dismiss plaintiff Hugo Zaldana's ("Zaldana") Second Amended Complaint ("SAC"); on March 30, 2009, defendant KB Home filed a joinder in the motion. Zaldana has filed opposition, to which the Countrywide defendants have replied. Having read and considered the papers filed in support of and in opposition to the motion, the Court rules as follows.

1. Contrary to defendants' argument, Zaldana has adequately alleged violations of § 8(a) and (b) of the Real Estate Settlement Practices Act ("RESPA"), 12 U.S.C. § 2607(a)

and (b).[1]  In particular, Zaldana has alleged that Countrywide[2] and KB Home created a "sham joint venture entity" (see SAC ¶ 6), specifically, CKB, to which KB Home "referred its customers, including [ ] Zaldana," and through which Countrywide paid KB Home a portion of the profits attributable to, inter alia, "those settlement service fees paid by Zaldana" (see SAC ¶ 37).

Further, contrary to defendants' argument, Zaldana has adequately alleged that CKB was a "sham" affiliated business arrangement, and, consequently, that defendants are not entitled to the safe harbor provided by § 8(c)(4) of RESPA.  See 12 U.S.C. § 2607(c)(4) (providing "[n]othing in this section shall be construed as prohibiting . . . affiliated business arrangements so long as (A) a disclosure is made of such an arrangement to the person being referred . . . (B) such person is not required to use any particular provider of settlement services, and (C) the only thing of value that is received from the arrangement, other than the payments permitted under this subsection, is a return on the ownership interest").  Defendants concede that, to come within the exception provided by § 8(c)(4), an entity must be a "bona fide provider of settlement services" (see Mot. at 10:5-12), and that the United States Department of Housing and Urban Development ("HUD") has set forth ten factors to be considered in determining whether an entity so qualifies, see Statement of Policy 1992-2, Sham Controlled Business Arrangements, 61 Fed. Reg. 29258, 29262 (June 7, 1996) ("Statement of Policy").[3]

---

[1]Section 8(a) provides: "No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a real estate settlement service involving a federally mortgage loan shall be referred to any person."
Section 8(b) provides:  "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed."

[2]The SAC states that "[w]here the term 'Countrywide' is used herein, it means [CFC] and/or [CHL], both of which did business at all relevant times as both 'Countrywide Home Loans' and 'Countrywide.'"  (See SAC ¶ 30 n.2.)

[3]Those factors are the following:

(1) Does the new entity have sufficient initial capital and net worth, typical in the

2

Here, Zaldana has alleged facts that, if true, would demonstrate CKB failed to meet a number of the HUD factors, including factors (2), (3), (4), (5), and (9). (See SAC ¶ 30 (alleging "to the extent the processing, underwriting, and funding of [CKB] loans was not performed directly by 'Countrywide' employees . . . it was performed by administrative employees that the [CKB] joint venture 'borrowed' from Countrywide"); id. ¶ 25 (alleging "the operation and management of [CKB] occurred by and through [CHL], a wholly owned subsidiary of [CFC]"); id. ¶ 31 (alleging "all persons who provided mortgage settlement

---

industry, to conduct the settlement service business for which it was created? Or is it undercapitalized to do the work it purports to provide?
(2) Is the new entity staffed with its own employees to perform the services it provides? Or does the new entity have "loaned" employees of one of the parent providers?
(3) Does the new entity manage its own business affairs? Or is an entity that helped create the new entity running the new entity for the parent provider making the referrals?
(4) Does the new entity have an office for business which is separate from one of the parent providers? If the new entity is located at the same business address as one of the parent providers, does the new entity pay a general market value rent for the facilities actually furnished?
(5) Is the new entity providing substantial services, i.e., the essential functions of the real estate settlement service, for which the entity receives a fee? Does it incur the risks and receive the rewards of any comparable enterprise operating in the market place?
(6) Does the new entity perform all of the substantial services itself? Or does it contract out part of the work? If so, how much of the work is contracted out?
(7) If the new entity contracts out some of its essential functions, does it contract services from an independent third party? Or are the services contracted from a parent, affiliated provider or an entity that helped create the controlled entity? If the new entity contracts out work to a parent, affiliated provider or an entity that helped create it, does the new entity provide any functions that are of value to the settlement process?
(8) If the new entity contracts out work to another party, is the party performing any contracted services receiving a payment for services or facilities provided that bears a reasonable relationship to the value of the services or goods received? Or is the contractor providing services or goods at a charge such that the new entity is receiving a "thing of value" for referring settlement service business to the party performing the service?
(9) Is the new entity actively competing in the market place for business? Does the new entity receive or attempt to obtain business from settlement service providers other than one of the settlement service providers that created the new entity?
(10) Is the new entity sending business exclusively to one of the settlement service providers that created it (such as the title application for a title policy to a title insurance underwriter or a loan package to a lender)? Or does the new entity send business to a number of entities, which may include one of the providers that created it?

See 61 Fed. Reg. at 29262.

3

1  services in connection with [CKB] loans [ ] were physically located in office space
2  possessed, controlled, and managed by Countrywide" and "were under the management
3  and control of Countrywide employees")[4]; id. ¶ 34 (alleging "the funds to close the loan
4  came directly to each closing from Countrywide bank accounts in exchange for immediate
5  assignments of the mortgages from [CMV] to Countrywide at the closing"); id. ¶ 22 (CKB
6  "only made loans to KB Home customers and always did so pursuant to referrals from KB
7  Home").) Defendants have cited no authority suggesting such allegations are insufficient to
8  allege CKB was a "sham" affiliated business arrangement. See Statement of Policy at
9  29262 (stating "HUD balances [the] factors; noting "[a] response to any one question by
10 itself may not be determinative of a sham controlled business arrangement").[5]

11     2.  Contrary to defendants' argument, Zaldana has adequately alleged a basis for
12 liability on the part of CMV, CKB, and CHL.  In particular, Zaldana has alleged the role each
13 such entity played in the alleged CKB "Joint Venture Referral Arrangement." (See SAC at
14 4:6; see also id. ¶¶ 20-37.)  The cases relied upon by Countrywide, in arguing such
15 allegations are insufficient, are distinguishable.  Those cases involve either the pleading
16 standard for fraud under Federal Rule of Civil Procedure 9(b), see Swartz v. KPMG LLP,
17 476 F.3d 756, 764-65 (9th Cir. 2007), or pleadings that contained only "generic boilerplate,"
18 see Moore v. Regents of Univ. of Cal., 51 Cal. 3d 120, 134 n.12 (1990).
19 //
20 //

---

[4] The Court finds unpersuasive Countrywide's argument that the above-referenced allegation is unavailing because the offices of CHL and CKB in Livermore, California, although located at the same street address, are located in different suites. (See Reply at 8:8-20; see also SAC Ex. G.)  In particular, CKB's use of a different suite than CHL does not necessarily mean that CHL did not "possess[ ], control[ ], and   manage[ ]" (see SAC ¶ 31) the space used by CKB.

[5] In light of the above, the Court does not reach Zaldana's argument that the CKB joint venture is not covered by § 8(c)(4) on the alternative ground that Countrywide and KB Home each received more than a "return on [their] ownership interest" from the venture, see § 8(c)(4)(C), nor does the Court reach Countrywide's Request for Judicial Notice, which is directed solely to such argument.  Further, the Court hereby denies as moot Zaldana's motion, filed April 30, 2009, for leave to file a sur-reply in response to Countrywide's Request for Judicial Notice.

4

**CONCLUSION**

For the reasons stated above, the motion to dismiss is hereby DENIED.

**IT IS SO ORDERED.**

Dated: May 8, 2009

MAXINE M. CHESNEY
United States District Judge